R00436.aa1; Claudio v. SOT






NUMBER 13-00-436-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

____________________________________________________________________

ENCARNACION CLAUDIO, JR., Appellant,


v.


THE STATE OF TEXAS, Appellee.

____________________________________________________________________



On appeal from the 138th District Court of Cameron County, Texas.

____________________________________________________________________


O P I N I O N


Before Justices Dorsey, Hinojosa, and Rodriguez

Opinion by Justice Hinojosa



 We issued our original opinion in this case on August 23, 2001. We withdraw our August 23, 2001 opinion and substitute
the following as the opinion of this Court.

 A jury found appellant, Encarnacion Claudio, Jr., guilty of the offense of murder, and assessed his punishment at life
imprisonment and a $10,000 fine. In three issues, appellant contends: (1) the evidence is factually insufficient to prove
that appellant intentionally or knowingly caused the victim's death; (2) the trial court erred by refusing appellant's requested
self-defense instruction; and (3) the trial court erred "by not instructing the jury on the issue of voluntary manslaughter." 
We affirm.

A. Background


 It was undisputed at trial that on February 12, 2000, appellant shot Arturo Orosco in the back of the head with a .357
magnum handgun, resulting in Orosco's death. However, the events leading up to the shooting are at issue. Three
eyewitnesses, including appellant, testified during the guilt/innocence phase of the trial.

1. Testimony of Rolando Robles

 Rolando Robles testified that appellant invited him and Orosco out to the Claudio family's ranch, a tract of land near the
expressway in San Benito. The three men were friends. When Robles and Orosco arrived, appellant was already there. 
The men spent the afternoon drinking beer, target shooting with appellant's .22 rifle and listening to music. A dispute
arose, however, when Robles asked appellant where he had been the previous Saturday night. Apparently, Robles
suspected that his girlfriend had gone out with his cousin, and that appellant had been with the couple Saturday night. 
Appellant replied that he had been "somewhere" Saturday night, and became incensed when Robles continued to question
him.

 At some point during the argument, appellant's cousin, Jorge Claudio, Jr., arrived in his car. Robles did not know Jorge. 
Jorge parked his car behind Robles's truck:

Prosecutor: Your car was out there?



Robles: Yes, ma'am.



Prosecutor: And, Chon's car was, too?



Robles: Was in front.



Prosecutor: Chon's car was in front?



Robles: Yes.



Prosecutor: And your car was here [indicating map]?



Robles: Yes, ma'am.



Prosecutor: And the other - where did [Jorge's] car go when it pulled up?



Robles: Right behind my truck.



Prosecutor: So all three of you were out there in this field, and Chon's car was in the lead?



Robles: Yes.



 The argument continued, then appellant and Jorge went to Jorge's car. When appellant walked back to where Robles and
Orosco were, appellant pulled a handgun from his waist and told them to "go back" and "go over there." Robles told
appellant, "Don't play like that, Chon. . . . Don't get mad." Robles and Orosco were both backing up when appellant shot
Orosco. Robles ran; as he did, Jorge grabbed his shirt, but Robles got away. Robles ran across the expressway, leaving his
truck behind. He hid for awhile at a closed lumberyard until he felt safe, then ran to a relative's home. Robles denied that
he and Orosco were trying to "jump" appellant, or that they fought with him.

2. Testimony of Jorge Claudio, Jr.


 Jorge testified that earlier that day, appellant had come to his house to retrieve a handgun he had lent Jorge. Appellant told
Jorge he was going to the ranch to drink beer, and had invited some friends. Later that day, at about 6:00 p.m., Jorge got a
call from appellant, who said that he needed some "esquina" (1) at the ranch. Jorge thought there was going to be a fistfight.

 When Jorge arrived at the ranch, appellant was arguing with two men. He saw appellant's car and another truck. Jorge
could not make out the words, but he heard raised voices. Appellant called Jorge over near the truck and told him he "was
going to shoot them." Appellant was angry. Jorge tried to calm appellant down, but appellant got a gun out of his
waistband and walked toward the two men, who were standing near appellant's car. One of the men was leaning on
appellant's car. Jorge could see the men were scared, but he thought appellant was just trying to scare them. 

 Then appellant told the men to move. The men "got back, because they were real scared." Jorge told appellant to "forget
it." Appellant was standing at the back of his own car. The men were standing in front of appellant's car. The three
vehicles were parked on a circular drive. The two men were "walking back, freaking out with their beers in their hands." 
Jorge never saw Orosco try to strike appellant with a beer bottle. Appellant shot one man in the back of the head, and the
man fell to his knees. Appellant then said, "What the hell did I do?" Appellant then looked at the other guy and raised the
gun. Jorge tried to get between appellant and the other guy, who was starting to run. Jorge did not want appellant to kill
anyone else. Jorge grabbed the man "to calm him down," but the man ran away. Appellant fired at the other man four or
five times, then told Jorge to leave. Appellant never told Jorge that the men had threatened him, or that he was afraid. 
Jorge left the scene in his car.

3. Testimony of Appellant


 Appellant testified that he first went to Jorge's house and picked up the handgun, which he knew was loaded, then drove to
the ranch in his vehicle to drink beer, listen to music, and shoot targets. Appellant became upset after Robles continued to
question him about his whereabouts on Saturday night. He felt Robles "was trying to pull things out of me, and arguing
with me . . . he [was] invading my privacy, and he [was] trying to force it out of me when I [didn't] want to tell him."
Robles would "smirk . . . and look at [Orosco] like, 'Do you believe him?'" Orosco looked like he was going to hit
appellant. Appellant called Jorge and told him to come to the ranch. He told Robles and Orosco that someone who could
tell them where he had been that night was coming over. At that point, Robles and Orosco looked "at each other. . . . What
is going to happen? What do we do?" Robles told appellant, "Well, you don't have to bring a witness. I believe you now." 

 When Jorge arrived, they were still arguing. Appellant walked over to Jorge and said he was going to tell the men he had
been with Jorge on the night in question. Appellant walked back to his car. 

Appellant's Counsel: And in front of [Robles'] pickup, was what?



Appellant: My vehicle.



Appellant's Counsel: And how would you get out of that situation?



Appellant: Well, normally, the only way, was the way that I went in, and that's reversing from where the path was. But at
that time, I could not do that because Roy's truck was behind my car.



Appellant's Counsel: And how - I mean, how many feet between your truck and the back of your car and Roy's truck?



Appellant: I would say, one and a half, to two. Just, you know, just enough space; about two feet.



Appellant's Counsel: Just enough space for a person to go by?



Appellant: Right.



Appellant's Counsel: So you couldn't - you were boxed in?



Appellant: Yes.



Orosco grabbed a twelve-ounce, unbroken beer bottle at the top and held it upside down. Appellant pulled out his gun and
told Orosco to back away. Robles and Orosco seemed "scared and surprised." Appellant told them several times to get
back, but they did not take him seriously. He felt Orosco was going to strike him with a beer bottle. Appellant felt he
"should use my gun just to scare them so they could see that I am protecting myself." Orosco said something, but appellant
does not remember what it was because at that point, his mind "went blank." Robles and Orosco had "spread out, and I
couldn't have them in sight at the same time." He was in fear for his life.

 While he was looking at Robles, appellant saw "some movement" from Orosco,

so I just turned and shot, because, I didn't see him clearly, but I saw - I saw like a flash. So I figured he was close to me. 
That's when I turned and shot. . . . I just shot, I did not think . . . at that moment, I didn't . . . think that - you know, that I
wanted to shoot. It just happened that I shot. I didn't think - I didn't have time to say, "Okay, I am going to push the trigger
so I can shoot." It just happened out of fear. Okay? . . . [a]nd anger ,too. Because - I mean, I had the anger already built
up, because they kept on pressuring me, to tell them where I was. And the fear built up after I saw their movements, where
I felt something was going to happened [sic].



 He also shot out of fear because he knew Robles and Orosco always carried knives, and feared that they would stab him. 
After Orosco fell, appellant thought, "I just can't believe I did that." At that point, appellant saw movement from Robles's
direction, but did not shoot at Robles. Jorge did not try to shield Robles.

 Afterwards, Jorge drove off in his own car. There was "a tall pile of dirt" in front of appellant's car: 

I start reversing my car, trying not to hit [Robles'] truck, so I can start turning my car, and trying to get through some of the
mesquites, knowing I may end up scratching my car. But that was the only way I was able to leave.



Appellant left the crime scene and drove home. 

4. Testimony of Dr. Lawrence Dahm


 Dr. Lawrence Dahm, who performed Orosco's autopsy, testified that Orosco died from a medium caliber wound to the left
side of the back of his head. The wound was consistent with being shot with a .357 magnum handgun, and the presence of
stippling around the wound indicated the shot was fired at close range, from twelve to fifteen inches away. Orosco also had
a defensive wound to his right hand, indicating his hand was covering the back of his head when he was shot. Orosco
sustained a second gunshot wound to the middle of the back of his head; this wound was inflicted while he was lying on the
ground.

5. Other Testimony


 Law enforcement officers who processed the crime scene found nothing indicating Orosco had used any type of weapon,
including a beer bottle. No knife was found on Orosco's body or anywhere at the crime scene.

 Orosco's wife testified that her husband sometimes carried a knife to use at work, but not always.

B. Factual Sufficiency


 In his first issue, appellant contends the evidence is factually insufficient to prove that he intentionally or knowingly
caused the death of Arturo Orosco.

 When we review the factual sufficiency of the evidence, we review all of the evidence and set aside the verdict only if it is
so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. Clewis v. State, 922
S.W.2d 126,133-34 (Tex. Crim. App. 1996). We are not bound to view the evidence in the light most favorable to the
prosecution, and may consider the testimony of all the witnesses. Johnson v. State, 23 S.W.3d 1, 10-12 (Tex. Crim. App.
2000);Clewis, 922 S.W.2d at 134. We consider all of the evidence in the record related to the appellant's sufficiency
challenge, comparing the weight of the evidence that tends to prove guilt with the evidence that tends to disprove it. 
Santellan v. State, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997). We are not free to reweigh the evidence and set aside a
jury verdict merely because we believe that a different result is more reasonable. Cain v. State, 958 S.W.2d 404, 407 (Tex.
Crim. App. 1997); Clewis, 922 S.W.2d at 135. Disagreeing with the fact finder's determination is appropriate only when
the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice; otherwise, due
deference must be accorded the fact finder's determinations, particularly those concerning the weight and credibility of the
evidence. Johnson, 23 S.W.3d at 10-12.

 After reviewing all the evidence, we hold that the verdict is not so against the overwhelming weight of the evidence that it
is manifestly unjust and clearly wrong. We hold the evidence is factually sufficient to support appellant's conviction.
Appellant's first issue is overruled.

C. Alleged Charge Error


 It is well-settled in Texas that jury charge error is analyzed according to whether the alleged error was objected to at trial. 
Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). First, we determine whether error exists in the charge; 

[i]f the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is
"calculated to injure the rights of defendant," which means no more than that there must be some harm to the accused from
the error. In other words, an error which has been properly preserved by objection will call for reversal as long as the error
is not harmless.



 On the other hand, if no proper objection was made at trial and the accused must claim that the error was "fundamental,"
he will obtain a reversal only if the error is so egregious and created such harm that he "has not had a fair and impartial
trial" -- in short "egregious harm."



Id.; see Tex. Code. Crim. Proc. Ann. art. 36.19 (Vernon 1981). 

1. Denial of the Self-Defense Instruction

 In his second issue, appellant contends the trial court erred by refusing to give the jury the self-defense instruction he
requested. 

 A defendant is entitled to an instruction on any properly-requested defensive issue raised by the evidence, regardless of
whether the evidence is weak or strong, unimpeached or contradicted, or credible or not credible. Granger v. State, 3
S.W.3d 36, 38 (Tex. Crim. App. 1999); Hamel v. State, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996); Riddle v. State, 888
S.W.2d 1, 6 (Tex. Crim. App. 1994). The defendant's testimony alone may be sufficient to raise a defensive theory
requiring a charge. Dyson v. State, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984). The issue is whether the evidence,
viewed in the light most favorable to appellant, is sufficient to raise the issue of self defense. Preston v. State, 756 S.W.2d
22, 24 (Tex. App.-Houston [14th Dist.] 1988, pet. ref'd). If the evidence viewed in this light does not establish
self-defense, an instruction is not required. Granger, 3 S.W.3d at 38;Dyson, 672 S.W.2d at 463. 

 A defendant requesting an instruction of self-defense with deadly force must show that: (1) he was justified in using force;
(2) a reasonable person in his situation would not have retreated; and (3) he reasonably believed the use of deadly force was
immediately necessary to protect himself against another's use or attempted use of unlawful deadly force, or to prevent the
imminent commission of specified violent crimes. Tex. Pen. Code Ann. § 9.32(a) (Vernon Supp. 2001). A person is
justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to
protect himself against the other's use of attempted use of unlawful force. Id. § 9.31(a). A "reasonable belief" is defined as
"a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Pen. Code Ann.
§ 1.07(a)(42) (Vernon 1994). In order to be entitled to an instruction on the use of deadly force in self-defense, a defendant
must produce some evidence on each of the three elements of Section 9.32. Werner v. State, 711 S.W.2d 639, 644 (Tex.
Crim. App. 1986); Holmes v. State, 830 S.W.2d 263, 265 (Tex. App.-Texarkana 1992, no pet.).

 In the instant case, even if we presume appellant presented evidence that he was justified in using deadly force and that he
reasonably believed that deadly force was immediately necessary to protect himself against Orosco's use or attempted use
of unlawful deadly force, appellant was still not entitled to a self-defense instruction because he failed to present any
evidence that, under these circumstances, a reasonable person would not have retreated. See Tex. Pen. Code Ann. §
9.32(a)(2) (Vernon Supp. 2001) (use of deadly force justified only if reasonable person in actor's situation would not have
retreated). Appellant testified that Orosco brandished a beer bottle at him, and that he feared Orosco and Robles because he
knew they carried knives. However, appellant's own testimony shows that he was holding a loaded weapon on Robles and
Orosco, and that his vehicle and his cousin's vehicle were nearby. Although appellant first testified that he normally exited
the ranch by reversing, but that he could not leave that way on the night of the shooting because Robles's vehicle was
parked behind his, he admitted on cross-examination that he drove home after the shooting. Appellant also testified that his
cousin Jorge was present, that Jorge's vehicle was parked at the end of the driveway with no vehicles parked behind it, and
that Jorge left in his own car. Appellant has offered no evidence showing why a reasonable person in this situation would
not have retreated. Therefore, we conclude appellant failed to sustain his burden to establish the requirements of the use of
deadly force in self-defense. See Werner, 711 S.W.2d at 644; Holmes, 830 S.W.2d at 265. We hold the trial court did not
err in refusing appellant's requested instruction of self defense. Appellant's second issue is overruled.

2. Omission of Instruction on


"Lesser Included Offense of Voluntary Manslaughter"




 In his third issue, appellant contends the trial court erred "by not instructing the jury on the issue of voluntary
manslaughter."

 For all homicides committed after August 31, 1994, a jury no longer has the option of finding a defendant guilty of
voluntary manslaughter. Wesbrook v. State, 29 S.W.3d 103, 113 n.7 (Tex. Crim. App. 2000); Moore v. State, 969 S.W.2d
4, 9 (Tex. Crim. App. 1998). Under present law, a defendant may attempt to prove the issue of sudden passion by a
preponderance of the evidence only at the punishment phase of the trial. Tex. Pen. Code Ann. § 19.02(d)(Vernon Supp.
2001); Wesbrook, 29 S.W.3d at 113 n.7. Sudden passion is not an affirmative defense, but only mitigates the punishment
the accused receives. Perez v. State, 940 S.W.2d 820, 822 (Tex. App.-Waco 1997, no pet.). If the jury finds the defendant
acted under the influence of sudden passion, the offense of which he has been found guilty is a felony of the second degree
rather than of the first degree. Tex. Pen. Code Ann. § 19.02(d) (Vernon Supp. 2001). Because appellant argues in his brief
that there was evidence of sudden passion, we will, therefore, interpret his third issue as a challenge to the trial court's
omission of a sudden passion instruction in the punishment charge.

 As we noted above, an accused is entitled to an instruction on every defensive issue raised by the evidence, regardless of
the strength or credibility of that evidence. Granger, 3 S.W.3d at 38; Hamel, 916 S.W.2d at 493; Riddle, 888 S.W.2d at 6.
In order to be entitled to receive a "sudden passion" instruction at punishment, a defendant must prove he caused the death
under the immediate influence of sudden passion arising from an adequate cause. See Tex. Pen. Code Ann. § 19.02(d)
(Vernon Supp. 2001). "Sudden passion" means passion directly caused by and arising out of the provocation by the
deceased that arises at the time of the offense and is not solely the result of former provocation. Tex. Pen. Code Ann. §
19.02(a)(2) (Vernon Supp. 2001). "Adequate cause" means cause that would commonly produce a degree of anger, rage,
resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. Tex. Pen.
Code Ann. § 19.02(a)(1)(Vernon Supp. 2001). These statutory definitions are substantially similar to the definitions found
in former section 19.04 of the penal code defining the now-repealed second-degree felony offense of voluntary
manslaughter. Compare Tex. Pen. Code Ann. § 19.02(d) (Vernon Supp. 2001) with Act of May 24, 1973, 63rd Leg., R.S.,
ch. 399, § 1, 1973 Tex. Gen. Laws 883, 913 (former Tex. Pen. Code Ann. § 19.02(b), (c), providing that voluntary
manslaughter is a death caused under the immediate influence of sudden passion arising from adequate cause), repealed by
Act of May 29, 1993, 73rd Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3614; see Merchant v. State, 810
S.W.2d 305, 310 (Tex. App.-Dallas 1991, pet. ref'd). Courts may look to decisions under the old voluntary manslaughter
law for guidance. Roberts v. State, 590 S.W.2d 498, 501 (Tex. Crim. App. 1979); Perez, 940 S.W.2d at.

 "Sudden passion" refers to the entire set of circumstances contemplated by this defensive issue. Ruiz v. State, 753 S.W.2d
681, 683 (Tex. Crim. App. 1988); Perez, 940 S.W.2d at 822. Sudden passion first requires that the record contain objective
evidence that direct provocation by the victim occurred at the time of the killing. Merchant, 810 S.W.2d at 310; Brunson v.
State, 764 S.W.2d 888, 894 (Tex. App.-Austin 1989, pet. ref'd). Evidence of prior provocation is not enough. Merchant,
810 S.W.2d at 310; see Hobson v. State, 644 S.W.2d 473, 478 (Tex. Crim. App. 1983). Second, the record must also
contain evidence from which the jury could subjectively decide the accused killed the victim while in an excited and
agitated state of mind arising out of the direct provocation. Merchant, 810 S.W.2d at 310. There must be evidence that the
accused acted in the throes of actual, subjective passion. Id.; Lopez v. State, 716 S.W.2d 127, 129 (Tex. App.-El Paso
1986, no pet.). Sudden passion is essentially a culpable mental state and may be inferred from the defendant's acts, words,
and conduct. Moore, 969 S.W.2d at 10.

 The objective inquiry into "adequate cause" also has two parts. Merchant, 810 S.W.2d at 310. First, the record must
contain some evidence of legally adequate cause. Id. The act of the victim in response to a criminal episode initiated by
the accused is not legally adequate cause. Harris v. State, 784 S.W.2d 5, 10 (Tex. Crim. App. 1989). Second, the cause
must be the kind that would produce anger, rage, resentment or terror in a person of ordinary temper so that the person is
incapable of cool reflection. Merchant, 810 S.W.2d at 310. Evidence of a cause that produces one of the listed responses
in the accused because of the accused's susceptibilities is not enough unless the cause would produce the response in an
ordinary person. Gonzales v. State, 689 S.W.2d 900, 903 (Tex. Crim. App. 1985); Daniels v. State, 645 S.W.2d 459, 460
(Tex. Crim. App. 1983). 

 The question is whether there was any evidence from which a rational jury could infer sudden passion. Moore, 969
S.W.2d at 11. Anything more than a scintilla of evidence is sufficient to entitle a defendant to a sudden passion instruction. 
Jones v. State, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). However, a bare claim of fear of the deceased is insufficient
to raise the issue of sudden passion arising from adequate cause. See Jenkins v. State, 740 S.W.2d 435, 443 (Tex. Crim.
App. 1983)(op. on reh'g), rev'd on other grounds, Saxton v. State, 804 S.W.2d 910 (Tex. Crim. App. 1991); Daniels, 645
S.W.2d at 460; Merchant, 810 S.W.2d at 310. Fear that demonstrates sudden passion must be that which commonly
produces a degree of terror sufficient to render the mind incapable of cool reflection. Gonzalez v. State, 717 S.W.2d 355,
357 (Tex. Crim. App. 1986). Evidence of the accused's fear is not enough unless the cause of the accused's fear could
produce fear that rises to a level of terror which makes a person of ordinary temper capable of cool reflection. Daniels, 645
S.W.2d at 460.

 In the instant case, appellant testified that the cause of his rage and fear was that Orosco brandished a beer bottle at him,
which enraged appellant, and that he knew Orosco and Robles carried knives, which caused him to be afraid. However, we
find no evidence in the record that, even if appellant acted under the influence of sudden passion, such passion was
provoked by an adequate cause: one that would produce anger, rage, resentment or terror in a person of ordinary temper so
that the person is incapable of cool reflection. See Merchant, 810 S.W.2d at 309-310. There are

a variety of situations in which the evidence would not require a charge. . . . The record could show no evidence of cause. 
It could show no evidence of provocative conduct, or at least none at the time of the killing. There could be evidence of a
cause which could produce anger, rage, resentment or terror adequate to make an ordinary person incapable of cool
reflection, but no evidence that the accused acted in an excited and agitated state of mind at the time of the killing. There
could be evidence of provocation, and that the accused acted in an excited and agitated state of mind at the time of the
killing, but no evidence that the cause would make a person of ordinary temper incapable of cool reflection.



Merchant, 810 S.W.2d at 309-310 (interpreting the analogous voluntary manslaughter statute). Here, there is no evidence
that: (1) the brandishment of a beer bottle, or (2) knowledge that the victim might be carrying knife is adequate cause that
would produce anger, rage, resentment or terror in a person of ordinary temper so that the person is incapable of cool
reflection. See Merchant, 810 S.W.2d at 309-310.

 Because appellant did not establish adequate cause, we hold the trial court did not err in not including a sudden passion
instruction in the punishment charge. Appellant's third issue is overruled.

 The judgment of the trial court is affirmed.





 FEDERICO G. HINOJOSA

 Justice





Do not publish. Tex. R. App. P. 47.3.



Opinion delivered and filed this the

13th day of September, 2001.

1. "Esquina" is Spanish slang for "back-up."